[Civ. No. 21962.   Second Dist., Div. Two.   May 29, 1957.]

CUTTER LABORATORIES, INC. (a Corporation), Appellant, v. R. W. OGLE AND COMPANY (a Corporation) et al., Respondents.

John W. Preston, Jr., Eckhoff & Slick and Robert P. Schifferman for Appellant.

Gray, Binkley & Pfaelzer, John T. Binkley and Orville A. Armstrong, Jr., for Respondents.

RICHARDS, J. pro tem.*—This is an appeal by the plaintiff from a judgment in its favor against the defendant R. W. Ogle and Company for $14,445 in an action brought by the plaintiff against R. W. Ogle and R. W. Ogle and Company, a corporation (hereinafter referred to as "Ogle Company"), upon an alleged joint venture between the plaintiff and the defendants Ogle and Ogle Company relating to the development of disposable syringes. A second cause of action sought an accounting of royalties alleged to be due to the plaintiff on all syringes manufactured and sold by the defendants; and a third cause of action sought judgment against the defendants for $25,749.60, with interest, for money had and received by the defendants for plaintiff's use and benefit.

The matter was tried before a jury, which rendered an advisory verdict only, and the court thereafter made and entered its findings of fact that, among other things, certain agreements entered into between the parties dated July 27, 1951, did not create or constitute a joint venture or partnership between them and that there was no joint venture between the plaintiff and the defendants or either of them for the development, manufacture or sale of any syringe; that under the agreements, the royalties payable by the Ogle Company to plaintiff and Ogle were on two types of syringe only and not on any other type or types of syringe manufactured and sold by the defendants; that the amount of royalties due and

*Assigned by Chairman of Judicial Council.

owing to the plaintiff from Ogle Company was $14,445. Judgment was entered accordingly, and whereas the defendants contended at the trial that no royalties were due the plaintiff, Ogle Company has not appealed from the judgment against it.

Plaintiff makes the following contentions on this appeal: (1) Insufficiency of the evidence to support the finding that the parties did not sustain the relation of joint adventurers, and the finding that appellant was entitled to royalties on only two types of syringe, (2) error in submitting the case to a jury for an advisory verdict, (3) errors in the jury instructions, (4) prejudicial misconduct by defense counsel, and (5) error in not awarding judgment against Ogle individually.

Viewing the evidence in the light most favorable to the respondents, as we must, it appears that the defendant Robert W. Ogle is an inventor, and during the years 1949 and 1950 he conceived an idea for a disposable syringe with a stoppered needle and corresponded with several pharmaceutical laboratories, including the plaintiff, concerning the development of such a syringe. On June 15, 1951, he executed an application for letters patent for a disposable syringe with a stoppered needle and this application was filed on July 9, 1951. The disposable syringe referred to in the patent application consists of a plastic barrel with a conventional steel needle in one end and a rubber piston in the barrel. Over the needle end of the barrel is a plastic cap or cork which, when pressed against the end of the barrel, forces the needle into the end of the plastic cap, thus providing a stopper or plug in the hollow end of the needle and hermetically sealing the needle against contamination and retaining the medicant in the barrel. Upon use, the cap or cork is removed and is screwed into the rubber piston and upon use of the packed dose the syringe is then disposed of. This invention was referred to throughout the trial as "Type 1 syringe." On July 27, 1951, a written agreement was entered into between the plaintiff, Ogle and Ogle Company reciting that Ogle had invented a disposable syringe for which application for letters patent had been made and that it was the desire of the parties "to mutually cooperate towards a successful commercialization of said Syringe in all its aspects" and by this agreement Ogle assigned to plaintiff one-half of his interest in "said invention of a Disposable Syringe"; plaintiff agreed to assign to Ogle a one-half interest in any invention it had or might acquire within any allowable claim of Ogle's invention; plaintiff and Ogle agreed to grant to Ogle Company the exclusive right to

manufacture the syringe and plaintiff agreed to purchase 11,000 of said syringes from the company and to advance to the company $10,000 as purchase price thereof. Contemporaneously the same parties entered into a second agreement reciting that plaintiff and Ogle were the coowners of inventions relating to a disposable syringe and that the Ogle Company was desirous of obtaining the exclusive manufacturing and sales rights thereto and that in consideration of the mutual covenants and conditions, plaintiff and Ogle granted such exclusive right to Ogle Company and the company agreed to pay a specified royalty ''for each Disposable Syringe of the Stoppered Needle Type,'' and ''for each Disposable Vial Syringe,'' the royalties to be equally divided between plaintiff and Ogle.

Following the execution of these documents, the company manufactured for plaintiff some of the Type 1 syringes, which proved unmarketable due to the fact that the plastic stopper or plug in the needle sometimes remained lodged in the hollow core of the needle when inserted into the patient. Thereafter, Ogle attempted to correct this condition and developed a second syringe, referred to as ''Type 2 syringe.'' Instead of cutting a plastic plug from the head of the cap or cork in which it was imbedded as in Type 1, the mouth of the needle in Type 2 syringe was seated in a rubber cap and the rubber, being resilient, did not form an actual plug or stopper in the needle and with the development of Type 2 syringe the company discontinued the manufacture of Type 1 syringe. The Type 2 syringe also proved unmarketable due to the fact that minute particles of the soft rubber were sometimes chewed off by the sharp point of the needle and these small pieces of rubber remained lodged in the hollow needle and produced a similar hazard to that encountered in the use of Type 1 syringe. Some time later Ogle conceived a new idea for sealing the end of the needle, not involving the use of a stopper or plug but by inserting the needle into a conical hole in the cap or cork so that the diagonal aperture of the needle fitted snugly against the inside of the plastic cap, thus retaining the medicant in the barrel of the syringe. This type of syringe was referred to as ''Type 3 syringe.'' Ogle's application for letters patent on the Type 3 was filed in May 1953 and letters patent subsequently issued· thereon. This device proved marketable and was licensed by Ogle to Ogle Company and several million of the Type 3 syringes were sold. The same company also manufactured and sold, during

the period in question, two other types of syringe not involving the use of either a needle or a stopper.

The principal question involved in this appeal is whether a joint venture existed between the parties entitling the plaintiff to royalties on all types of disposable syringes manufactured and sold by Ogle Company. ▆ A joint venture has been defined as "an undertaking by two or more persons jointly to carry out a single business enterprise for profit" (*Nelson* v. *Abraham*, 29 Cal.2d 745, 749 [177 P.2d 931]). ▆▆ The relationship of joint adventurers is founded on contract (*Campagna* v. *Market St. Ry. Co.*, 24 Cal.2d 304, 308 [149 P.2d 281]), and whether the parties have created such a relationship as between themselves depends on their actual intention, to be determined in accordance with the ordinary rules governing the interpretation of contracts (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 764 [128 P.2d 665]), and "[a]s an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement (citations), including the object, nature and subject matter of the writing (citations), and the preliminary negotiations between the parties (citations), and thus place itself in the same situation in which the parties found themselves at the time of contracting" (*Universal Sales Corp.* v. *California etc. Mfg. Co., supra*, p. 761).

▆ The plaintiff contends that a joint venture was established as a matter of law by the written agreements between the parties and that the trial court erred in finding to the contrary. If we understand its argument correctly, the contention is that the object of the joint venture alleged to have been created by the agreements was the development of disposable syringes generally, and it is not contended that a joint venture was established for the business of manufacturing and selling syringes. Construing the two agreements together, as plaintiff insists we should, we cannot see that they contemplate the carrying out of a business enterprise of developing a disposable plastic syringe, but rather that the agreements contemplate the payment of royalties to be derived from the manufacture and sale of a described disposable syringe which Ogle had already developed to the point of filing a patent application. Plaintiff vigorously asserts that the recital clause in one of the agreements that "it is the desire of the parties to mutually cooperate towards a successful commercialization of said Syringe in all its aspects" shows

the intent of the parties to create a joint venture in the development of any type of disposable syringe. It will be noted that in this clause reference is made to "said Syringe" which in the same agreement is previously referred to as the syringe for which Ogle had made application for a patent. The quoted clause, which we believe was an expression of the intent of the parties, fully justified an inference that the purpose of the agreement was not to establish a business of developing a syringe but the commercialization of a syringe already developed by Ogle, and we cannot say that the court erred in finding that the agreements did not establish a joint venture.

*Universal Sales Corp.* v. *California etc. Mfg. Co.* (*supra*), upon which the plaintiff places great reliance, involved a written contract by which plaintiff agreed to purchase a certain pellet press and defendant agreed to pay to the plaintiff a fixed percentage on all sales of similar presses manufactured and sold by defendant. The agreement therein further provided that defendant would endeavor to patent the machine or any improvements thereon and would transfer to plaintiff a 20 per cent interest in any such patent or in any improvements thereon that might be made by either party. Thereafter the defendant developed a variant form of press which was successful and the plaintiff sued for its interest in the patents on the new press and for its share of the sales thereof. The trial court found that the contract was an agreement of the parties to cooperatively endeavor to perfect the press and improvements thereon and that the plaintiff was entitled to a recovery. The question on appeal was whether the evidence consisting of the agreement itself and the negotiations and dealings of the parties was sufficient to sustain the findings of the trial court, and it was held that the evidence was sufficient to establish that there had been created between the parties a relationship akin to a joint venture, and that the construction given to the contract by the trial court appeared to be consistent with the intent of the parties and therefore another interpretation would not be given to the agreement although equally tenable. A careful reading of the decision indicates that the factor which differentiates it from the matter at bar is that the agreement in the Universal Sales case expressly covered improvements on the existing machine and that it was clear from the agreement that the parties intended to associate themselves for the development of a marketable machine, with the original model as provisional rather

than a perfected machine. The decision does not necessitate a similar interpretation of the contracts before us. *Pacific Atlantic Wine, Inc.* v. *Duccini,* 111 Cal.App.2d 957 [245 P.2d 622], cited by plaintiff, reversed a judgment based upon a nonsuit on the ground that there was sufficient evidence upon which the court could have drawn an inference of the creation of a joint venture, but did not decide whether a joint venture was or was not created by the evidence. In *Replogle* v. *Ray,* 48 Cal.App.2d 291 [119 P.2d 980], also relied upon by plaintiff, the existence of a joint venture was conceded and the only question before the trial court and on appeal was the scope and duration of the venture.

Extensive testimony was presented by each side on the issue of joint venture, and the trial court found upon conflicting evidence that no joint venture existed for the development, manufacture or sale of any type of syringe. ■ The question whether the relationship of joint venture was created was primarily a question for the trial court to determine from the facts and inferences to be drawn therefrom (*Spier* v. *Lang,* 4 Cal.2d 711, 716 [53 P.2d 138]; *Goldberg* v. *Paramount Oil Co.,* 143 Cal.App.2d 215, 220 [300 P.2d 329]; *O. Krenz C. & B. Works* v. *England,* 109 Cal.App. 747, 751 [293 P. 689]). ■ Although the plaintiff contends that this finding is without evidentiary support, it has utterly failed to demonstrate that there is no substantial evidence to support it. Mr. Fred Cutter, vice-president and secretary of the plaintiff corporation, who was the principal representative in the negotiations with the defendants, testified that a joint venture was never intended as to the manufacture of syringes. A review of the correspondence between the parties relating to Ogle's development of Type 3 syringe clearly shows that plaintiff's only claim was to royalties on the Type 3 syringe pursuant to the royalty provisions of the agreements and not on any basis of a joint venture in the development of the syringe. Illuminating also is the fact that plaintiff had filed two previous actions against the defendants, each of which was subsequently dismissed, and in neither of them did plaintiff make any allegation that the parties were joint adventurers. There is in the record certain testimony of Mr. Cutter concerning the relationship of a joint interest in the syringe, but this testimony merely created a conflict in the evidence which was resolved by the trial court. ■ It is an established rule that where the evidence is in conflict, an appellate

court will not disturb the findings of the trial court unless it be demonstrated that there is no substantial evidence to sustain the trial court's findings. (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].)

We turn now to the finding that under the agreements of the parties, plaintiff was entitled to royalties on only Type 1 and Type 2 syringes and not on any other syringe manufactured and sold by the defendants. The court specifically found that the royalties payable under the agreements were only on "disposable syringes of the stoppered needle type" and further found that only Type 1 and Type 2 syringes were "stoppered needle" syringes. Notwithstanding testimony of plaintiff's expert witness that in his opinion Type 3 syringe was a stoppered needle syringe, there was testimony by Mr. Ogle that it was not a stoppered needle syringe, and the court had before it not only the patent application but samples of the various syringes from which it could make its own visual appraisal of the contention that Type 3 was a stoppered needle syringe. We have examined the same exhibits and cannot say that the trial court's finding that Type 3 syringe was not embraced within the royalty agreement lacks evidentiary support.

Plaintiff's next three assignments of error revolve around the court's submission of equitable issues to the jury. Over the plaintiff's objection, the entire case was tried before a jury. At the conclusion of the trial, the court submitted certain issues of fact to the jury, which rendered a verdict only upon the issues so submitted and did not render a general verdict on any issue. ■ An action brought under the provisions of Code of Civil Procedure, section 1060, to declare the existence of a partnership or a joint venture and an accounting thereon is equitable in nature and neither party is entitled to a jury trial thereon as a matter of right (*Dills* v. *Delira Corp.,* 145 Cal.App.2d 124, 129 [302 P.2d 397]). ■ "If the action is addressed to equity powers of the court, the matter is one for the trial court alone or sitting with an advisory jury" (*Dills* v. *Delira, supra,* p. 128). ■ In an equitable action the court in its discretion may permit a jury trial but the jury's verdict is merely advisory and does not bind the court. (*Bettencourt* v. *Bank of Italy,* 216 Cal. 174, 179 [13 P.2d 659]; *Olson* v. *Foster,* 42 Cal.App.2d 493, 498 [109 P.2d 388].) ■ It is clear that in the case at bar the court treated the entire case as an equity action and submitted the issues to the jury for an advisory verdict

only. The court abdicated none of its functions to the jury, as the plaintiff contends, as it made findings of fact on all of the issues raised by the pleadings. Plaintiff is in no position to complain, as the entire case was tried by the court, the jury acting in an advisory capacity only.     We find it unnecessary to consider the numerous claims of error in the jury instructions for the reason that if any of such instructions were erroneous such error is not a ground for reversal inasmuch as the verdict was merely advisory (*Richardson* v. *City of Eureka,* 110 Cal. 441, 446 [42 P. 965]; *Myrick* v. *Bruetsch,* 13 Cal.App.2d 219, 225 [56 P.2d 591]; *Wells Fargo Bank* v. *Brady,* 116 Cal.App.2d 381, 402 [254 P.2d 71]).     Contention is made that defense counsel was guilty of misconduct in certain statements made in the presence of the jury, but such a matter would not justify a reversal in any event since the jury acted only in an advisory capacity and findings on all of the issues were made by the court (*Myrick* v. *Bruetsch, supra,* p. 225).

The only remaining question is whether the judgment should have been awarded against Ogle individually. The court found that the recognition of Ogle Company as a separate entity from Ogle, as an individual, would not sanction any fraud or promote any injustice.     ''In the absence of confusion of corporate with individual affairs, or failing to disclose to third parties the existence of the two entities, or abuse or bad faith in the exercise of corporate control, the corporate entity will not be disregarded'' (*Shafford* v. *Otto Sales Co., Inc.,* 119 Cal.App.2d 849, 862 [260 P.2d 269]). Here there was no confusion of corporate with individual affairs, all of the manufacturing and selling being carried on by Ogle Company and all of the patent development being carried on by Ogle individually. Also there was no failure to disclose the existence of the two entities, for in the inception of the transaction plaintiff entered into the joint patent ownership agreement with Ogle, as an individual, and into a licensing agreement with Ogle Company by which Ogle Company only was obligated to pay royalties which were to be divided equally between plaintiff and Ogle individually. Even after the dispute arose as to plaintiff's right to royalties on Type 3 syringe, the correspondence between the parties shows that it continued to recognize the separate entities of Ogle and Ogle Company. There is evidence that after plaintiff attached Ogle Company's machinery and equipment that one check of company funds was deposited in Ogle's personal

bank account, but this isolated fact is clearly insufficient to prove abuse or bad faith in the exercise of corporate control and to necessitate a finding that the corporate entity should be disregarded.

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.